UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PALM BEACH DIVISION

Case No. _____

| | |
|---|---|
| ISAAC TORDJMAN, individually and on behalf of all others similarly situated,<br><br>                      Plaintiff,<br><br>   v.<br><br>TOYOTA MOTOR NORTH AMERICA, INC., and TOYOTA MOTOR CORPORATION,<br><br>                  Defendants. | JURY TRIAL DEMANDED |

**<u>CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

<u>Page</u>

I.      INTRODUCTION ...................................................................................................1

II.     PARTIES ...............................................................................................................4

        A.      Plaintiff ......................................................................................................4

                1.      Plaintiff Isaac Tordjman ................................................................4

        B.      Defendants .................................................................................................5

III.    JURISDICTION ....................................................................................................6

IV.     VENUE ..................................................................................................................7

V.      FACTUAL ALLEGATIONS ................................................................................7

        A.      Toyota's History of Defective Fuel Delivery Systems .............................7

        B.      Toyota Has Not Remedied the Fuel Pump Defect in Affected
                Vehicles....................................................................................................11

        C.      NHTSA Complaints Reveal That the Fuel Pump Defect Poses
                Serious Safety Risks ................................................................................12

        D.      Toyota Sells, Markets and Advertises Toyota and Lexus Brand
                Vehicles as Safe and Reliable .................................................................16

        E.      Plaintiff and Class Members Would Not Have Purchased or
                Leased, or Would Have Paid Less for, Affected Vehicles Had They
                Known of the Fuel Pump Defect .............................................................21

        F.      Toyota Has Manipulated Its Warranty to Minimize Its Obligation
                to Fix the Fuel Pump Defect in Affected Vehicles .................................21

        G.      Allegations Establishing Agency Relationship Between
                Manufacturer Toyota and Toyota Dealerships. ......................................22

VI.     TOLLING OF THE STATUTE OF LIMITATIONS ..........................................25

        A.      Discovery Rule Tolling............................................................................25

        B.      Fraudulent Concealment Tolling .............................................................26

        C.      Estoppel....................................................................................................26

010928-11/1271784 V1

VII.    CLASS ALLEGATIONS .......................................................27

     A.    Claims Brought on Behalf of the Nationwide Class ...............................30

COUNT I  VIOLATIONS OF 15 U.S.C. § 2301, *ET SEQ.* THE MAGNUSON-
MOSS WARRANTY ACT..................................................................30

COUNT II  FRAUDULENT CONCEALMENT  (BASED ON COMMON LAW) ...................32

COUNT III  BREACH OF CONTRACT (COMMON LAW)...........................................35

     B.    Claims Brought on Behalf of the Florida Subclass................................36

COUNT IV  VIOLATIONS OF THE FLORIDA DECEPTIVE AND.......................................36

UNFAIR TRADE PRACTICES ACT ("FDUTPA") (FLA. STAT. ANN.
§ 501.201, *ET SEQ.*) ...................................................................36

COUNT V  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(FLA. STAT. ANN. §§ 672.314 AND 680.212) .................................38

COUNT VI  BREACH OF COVENANT OF GOOD FAITH AND FAIR
DEALING (BASED ON FLORIDA STATE LAW) ........................................40

REQUEST FOR RELIEF ...................................................................41

DEMAND FOR JURY TRIAL ...............................................................42

010928-11/1271784 V1

Plaintiff Isaac Tordjman, on behalf of himself and all others similarly situated (the "Class"), alleges the following based upon the investigation of counsel and information and belief as noted.

## I.   INTRODUCTION

1.      One of the most significant advancements in the internal combustion engine over the last 30 years has been the widespread adoption of fuel injection systems instead of carburetors to supply fuel to the engine. The fuel injection system uses fuel pumps to efficiently and effectively (when working correctly) manage the flow of fuel from the fuel tank to the engine in order to maintain operability and prevent engine stalling. The fuel delivery system is one of the most basic safety features in every modern car because it controls speed and keeps the engine running unless and until an operator wants to turn the engine off. If the fuel delivery system in a car is defective, then the car is unsafe to operate because it will not predictably respond to operator input to accelerate and it could stall or completely lose power while in motion. Toyota has sold and marketed the Affected Vehicles defined below with defective low-pressure fuel pumps that cause unpredictable acceleration and engine stalls and render the Affected Vehicles unsafe to operate.

2.      This lawsuit arises because Toyota Motor Corporation and its U.S. distributor, Toyota Motor North America, Inc. (collectively, "Toyota"), knew that the low-pressure fuel pumps in the vehicles identified as "Affected Vehicles" below contained a defect that causes systemic fuel system failures. Yet Toyota refuses to repair or replace such defective systems and continues to sell—and require its customers to drive—its vehicles with the defective fuel delivery system— which could result in injuries or even deaths that could otherwise be avoided.

3.      Affected Vehicles include all Toyota and Lexus models that use the Denso low-pressure fuel pumps and fuel pump assemblies that begin with part number prefixes 23220- and 23221-. Toyota has instituted multiple safety recalls in the United States concerning the defective

low-pressure fuel pumps, including one on January 13, 2020, when Toyota submitted a safety recall report (the "1-13-20 Recall Report") to NHTSA voluntarily recalling nearly 700,000 Toyota and Lexus vehicles.[1] That recall report was supplemented and amended such that Affected Vehicles now include at least the following Toyota and Lexus models:

- 2018–2019 Toyota Avalon
- 2018–2019 Toyota Corolla
- 2018–2019 Toyota Highlander
- 2018–2019 Toyota Sequoia
- 2018–2019 Toyota Tacoma
- 2014–2015, 2018–2019 Toyota Forerunner
- 2018–2019 Lexus GS300
- 2014–2015 Lexus GX460
- 2017 Lexus IS200t
- 2014–2015, 2018–2019 Lexus IS350
- 2018–2019 Lexus LC500h
- 2018–2019 Lexus LS500
- 2014–2015 Lexus LX570
- 2018–2019 Lexus RC300
- 2015, 2018–2019 Lexus RC350
- 2018–2019 Lexus RX350

- 2018–2019 Toyota Camry
- 2014 Toyota FJ Cruiser
- 2014–2015, 2018–2019 Toyota Land Cruiser
- 2018–2019 Toyota Sienna
- 2018–2019 Toyota Tundra
- 2018–2019 Lexus ES350
- 2013–2014, 2018–2019 Lexus GS350
- 2014 Lexus IS-F
- 2018–2019 Lexus IS300
- 2018–2019 Lexus LC500
- 2013–2015 Lexus LS460
- 2018–2019 Lexus LS500h
- 2015 Lexus NX200t
- 2017 Lexus RC200t
- 2017–2019 Lexus RX350

---

[1] A true and correct copy of the 1-13-20 Recall Report is attached as Exhibit A to this Complaint.

If further investigation reveals that additional Toyota and Lexus vehicles contain the same defective low-pressure fuel pumps and assemblies, then the models identified as Affected Vehicles may be amended.

4.      The 1-13-20 Recall Report identified a dangerous defect (the "Fuel Pump Defect") in the low-pressure fuel pump, which can fail and cause the Affected Vehicles to unexpectedly stall, sputter, and cause engine shutdown. The main source of the defect is the impeller, which is a rotor that increases the pressure and flow of fuel. The Recall Report describes the defect as follows:

> These fuel pumps contain an impeller that could deform due to excessive fuel absorption. . . . [i]f impeller deformation occurs, the impeller may interfere with the fuel pump body, and this could result in illumination of check engine and master warning indicators, rough engine running, engine no start and/or vehicle stall . . . .

5.      Approximately 695,541 Toyota and Lexus vehicles are expressly covered by the 1-13-20 Recall Report, but the same dangerous condition is present in millions of Toyota and Lexus vehicles equipped with the low-pressure fuel pump with part number prefix 23220- or 23221-. The Fuel Pump Defect endangers drivers, passengers, and other persons and property in the vicinity of an Affected Vehicle at any time that it is in motion. The Fuel Pump Defect thus renders the Affected Vehicles less safe and less valuable than consumers would reasonably expect and it makes them less safe and less valuable than the Affected Vehicles would be if Toyota did not design and sell the Affected Vehicles with the Fuel Pump Defect.

6.      Plaintiff accordingly brings this class action complaint to recover on behalf of the Class all relief to which they are entitled, including but not limited to the recovery of the purchase price of their vehicles, compensation for overpayment and diminution in value of their vehicles,

- 3 -

out-of-pocket and incidental expenses, and an injunction compelling Toyota to replace or recall and fix the Affected Vehicles.

## II.    PARTIES

### A.    Plaintiff

7.      Plaintiff and each and every Class member has suffered an ascertainable loss as a result of Toyota's omissions and/or misrepresentations associated with the Affected Vehicles, including but not limited to out-of-pocket loss and diminished value of the Affected Vehicles.

8.      None of the Defendants, nor any of their agents, dealers, or other representatives informed Plaintiff or Class members of the Fuel Pump Defect in the Affected Vehicles prior to purchase.

9.      Plaintiff received information about the characteristics, benefits, safety, and quality of the Affected Vehicles at the dealership and/or through Toyota's extensive advertising concerning quality and safety, as intended by Toyota. None of the information Plaintiff received disclosed the Fuel Pump Defect prior to the vehicle's purchase.

### 1.    Plaintiff Isaac Tordjman

10.      Plaintiff Isaac Tordjman is a resident of Boca Raton, Florida, domiciled in the Southern District of Florida. On or about March 15, 2018, Plaintiff leased a new 2018 Lexus RX350 (for the purpose of this section, the "Affected Vehicle") from Lexus of North Miami in North Miami, Florida, for personal use. Plaintiff leases the Affected Vehicle for approximately $600.

11.      Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a fuel delivery system that was defective and did not function safely, as advertised, or as intended by its design. Toyota's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Fuel Pump Defect

- 4 -

has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

12.    Plaintiff uses the Affected Vehicle for personal and family uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that Toyota placed on the window. The window sticker advertised the Affected Vehicle's various features (such as the price, specifications, gas mileage, equipment and warranty details, and crash test ratings), and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

13.    Toyota never told Plaintiff about the Fuel Pump Defect, so Plaintiff purchased his Affected Vehicle on the reasonable, but mistaken, belief that his Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for a Toyota vehicle because he believed Toyota's persistent advertising messaging that its vehicles were of high quality, were safe, and were reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had a defect or the fact that Toyota would be unable to repair the defect. Had Toyota disclosed the Fuel Pump Defect, and the fact that Toyota would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and he would not have purchased the Affected Vehicle or would have paid less for it.

**B.    Defendants**

14.    Defendant Toyota Motor North America, Inc. ("TMNA") is incorporated in California and headquartered in Plano, Texas. TMNA is Toyota's U.S. sales and marketing arm, which oversees sales and other operations in 49 states. TMNA's predecessor entity was Toyota Motor Sales, Inc. ("TMS"), which was headquartered and incorporated in California. Prior to the

changeover, TMS, and now TMNA, distributes Toyota, Lexus, and Scion vehicles and sells these vehicles through its network of dealers. Money received from the purchase of a Toyota vehicle from a dealer flows from the dealer to TMNA.

15.     Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation. TMC is the parent corporation of Toyota Motor Sales, U.S.A., Inc. TMC, through its various entities, designs, manufactures, markets, distributes, and sells Toyota, Lexus, and Scion vehicles in Ohio and multiple other locations in the United States and worldwide.

16.     TMNA and TMC sell Toyota vehicles through a network of dealers who are the agents of TMNA and TMC.

17.     TMNA and TMC are collectively referred to in this complaint as "Toyota" unless identified as TMNA or TMC.

18.     Toyota manufactured, sold, and warranted the Affected Vehicles throughout the United States. Toyota and/or its agents, divisions, or subsidiaries designed, manufactured, and installed the defective fuel delivery system in the Affected Vehicles

### III.     JURISDICTION

19.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000 and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims because those claims are integrally related to the federal claims and form part of the same case and controversy under 28 U.S.C. § 1367.

20.     This Court has personal jurisdiction over Toyota Motor Corporation ("TMC") by virtue of its transacting and doing business in this District. TMC has purposefully availed itself of the benefits and protections of the Southern District of Florida by continuously and systematically

- 6 -

conducting substantial business in this judicial district. TMC has intentionally and purposefully sold, supplied, and distributed Affected Vehicles into the stream of commerce within Florida and throughout the United States.

21. This Court has personal jurisdiction over Toyota Motor North America, Inc. by virtue of its transacting and doing business in this District.

## IV.   VENUE

22. Venue is proper pursuant to 28 U.S.C. § 1391(a) & (b) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) because Plaintiff resides in this judicial district for venue purposes. Toyota licenses authorized dealers in this District, it advertises in this District, and it profits from its activities conducted within this District.

## V.   FACTUAL ALLEGATIONS

### A.   Toyota's History of Defective Fuel Delivery Systems

23. Toyota sources many of the electrical components in its vehicles from Denso Corporation, a Japanese auto parts supplier whose largest shareholder is Toyota, which owns approximately 24% of Denso. As early as 2015, Denso had recognized that the low-pressure fuel pumps that it supplied to Toyota and other manufacturers were prone to failure. In a patent application filed in 2016, Denso admitted that the composite (plastic) impellers in their low-pressure fuel pumps "may be swelled due to the fuel and water contained in the fuel, therefore a rotation of the impeller may be stopped when the impeller is swelled and comes in contact with the [fuel pump] housing."[2]

---

[2] U.S. Patent Application No. 15767375, *Impeller for Fuel Pump*, (application date Oct. 26, 2016) (Denso Corporation, et al. applicants), available at https://patentscope.wipo.int/search/en/detail.jsf?docId=US231859533 (last visited April 19, 2020).

24.     This same defect, the Fuel Pump Defect as defined above, has been a recurring theme in an ever-increasing list of vehicles that Toyota has now belatedly admitted contain the defective Denso low pressure fuel pumps and contain a safety defect.

25.     In the 1-13-20 Recall Report, Toyota states that it began an investigation of failures of its low-pressure fuel pumps in June 2019:

> In mid-June, Toyota began an investigation, including the recovery of failed parts from the field. The supplier [(Denso)] began inspection and analysis of the recovered parts and identified impeller deformation inside the fuel pump assembly due to more fuel absorption into the impeller material, with signs of binding/interference between the pump impeller and the pump casing/cover. A further analysis of failed impellers was conducted and it was confirmed that the failed impellers had a lower density. Generally, impellers with lower density are more susceptible to fuel absorption.
>
> As part of ongoing parts analysis, an additional observation was made of cracking to the impeller surface. To understand the relationship between surface cracks and pump failure, Toyota began an investigation to identify factors potentially contributing to cracking.

26.     As of January 7, 2020, there were 66 Toyota Field Technical Reports and 2,571 warranty claims received by Toyota from U.S. sources that relate to the Fuel Pump Defect.[3]

27.     In a March 4, 2020 press release, Toyota Australia announced that it would recall 45,683 vehicles with defective low-pressure fuel pumps, stating: "This is the same issue as the recall initiated in North America in January 2020. After further investigation, we are now initiating a global recall and adjusting the scope of affected vehicles in North America."[4] Toyota also disclosed that it would replace the low-pressure fuel pumps with versions improved in April 2019, and provided the following information to customers:

---

[3] *See* Exhibit A.

[4] The press release is attached as Exhibit B to this Complaint.

Q3.   What does the remedy involve?

A3.   For all involved vehicles, Toyota dealers will replace the low-pressure fuel pump with an improved one free of charge to customers. …

Q5.   What was the improvement made to the fuel pump?

A5.   In April 2019, the production process was changed so that the fuel pump impellers were improved.[5]

28.   On March 4, 2020, Toyota submitted an amended recall (the "3-4-20 Recall Report"), nearly tripling the number of recalled cars from 695,541 to 1,817,969. The expansion included the following, which is the bulk of the entire line-up of Toyota and Lexus offerings in the United States from as early as 2013.

- 2018–2019 Toyota Avalon
- 2018–2019 Toyota Corolla
- 2018–2019 Toyota Highlander
- 2018–2019 Toyota Sequoia
- 2018–2019 Toyota Tacoma
- 2014–2015 Toyota 4Runner
- 2018–2019 Lexus GS300
- 2014–2015 Lexus GX460
- 2017 Lexus IS200t
- 2014–2015, 2018–2019 Lexus IS350
- 2018–2019 Lexus LC500h
- 2018–2019 Lexus LS500
- 2014–2015 Lexus LX570

- 2018–2019 Toyota Camry
- 2014 Toyota FJ Cruiser
- 2014–2015 Toyota Land Cruiser
- 2017–2019 Toyota Sienna
- 2018–2019 Toyota Tundra
- 2018–2019 Lexus ES350
- 2013–2014, 2018–2019 Lexus GS350
- 2014 Lexus IS-F
- 2018–2019 Lexus IS300
- 2018–2019 Lexus LC500
- 2013–2015 Lexus LS460
- 2018–2019 Lexus LS500h
- 2015 Lexus NX200t

---

[5] *Id.*

- 9 -

- 2018–2019 Lexus RC300
- 2015, 2018–2019 Lexus RC350
- 2018–2019 Lexus RX35

- 2017 Lexus RC200t
- 2017–2019 Lexus RX350

29.    In the 3-4-20 Recall Report,[6] Toyota describes the same Fuel Pump Defect:

> The subject vehicles are equipped with a low-pressure fuel pump, located in the fuel tank[ ] that supplies fuel pressure to the fuel injection system. These fuel pumps may include impellers which have been manufactured with lower density. If these impellers are also (1) of a type with lower surface strength or (2) of a different type but were exposed to production solvent drying for longer periods of time, higher levels of surface cracking may occur. In this condition, excessive fuel absorption may occur, resulting in increased impeller deformation. In some cases, the impeller may deform to a point that creates sufficient interference with the fuel pump body to cause the fuel pump to become inoperative. An inoperative fuel pump due to these conditions could result in illumination of check engine and master warning indicators, rough engine running, engine no start and/or vehicle stall while driving at low speed. However, in rare instances, vehicle stall could occur while driving at higher speeds, increasing the risk of a crash.[7]

30.    Just two weeks later, on March 19, 2020, Toyota revised its recall report to NHTSA, yet again adding even more models to those with the known Fuel Pump Defect. The 3-19-20 Recall Report brought the total recalled vehicles to include 1,830,752 Toyota and Lexus vehicles.[8]

31.    On information and belief, even the staggeringly large recall described in the 3-19-20 Recall Report does not capture all of the Affected Vehicles. It does not include all of the 2013–2019 Toyota and Lexus vehicles that were equipped with Denso low-pressure fuel pumps and fuel pump assemblies that begin with part number prefixes 23220- and 23221-, and the single common part in every model that Toyota has recalled for the admitted fuel delivery system defect.

---

[6] *See* recall report attached as Exhibit C.

[7] *See id.*

[8] The 3-19-20 Recall Report is attached as Exhibit D.

- 10 -

32.    As of March 2020, there were 73 Toyota Field Technical Reports and 3,358 warranty claims received by Toyota from U.S. sources that relate to the Fuel Pump Defect.

33.    According to one news article, Toyota has initiated global recalls of 3.2 million vehicles in connection with the Fuel Pump Defect.[9]

**B.    Toyota Has Not Remedied the Fuel Pump Defect in Affected Vehicles**

34.    The Fuel Pump Defect in the Affected Vehicles is dangerous to drivers, vehicle occupants, and innocent bystanders. A vehicle that fails to accelerate when demanded, or stalls while in motion, is simply unsafe to operate.

35.    Toyota has not fixed the recalled vehicles, or any other Affected Vehicles, despite its admission of the existing safety defect relating to the low-pressure fuel pump. Owners of Affected Vehicles can only guess whether there will be a repair or replacement of the Fuel Pump Defect, and, if so, when.

36.    Rather than spend the money necessary to address the defect, or at least warn its customers that they have cars equipped with faulty fuel pumps, Toyota has shifted the significant and serious risk of inoperable vehicles, accidents, injury and even death onto its customers.

37.    Toyota has not recommended or advised that consumers stop driving Affected Vehicles pending repair or replacement of the Fuel Pump Defect. Even though it knows and admits that the Fuel Pump Defect could cause high-speed stalls and other dangerous conditions, Toyota is unwilling to spend the money necessary to provide alternative transportation to its customers. Instead, it makes them chose between driving a car with a known dangerous defect, or driving nothing at all. On information and belief, hundreds of thousands of owners of Affected Vehicles

---

[9] *See* Chester Dawson, *Toyota Recalls 3.2 Million Vehicles Globally to Fix Fuel Pumps*, Bloomberg.com, Mar. 4, 2020, available at https://www.bloomberg.com/news/articles/2020-03-04/toyota-recalls-3-2-million-vehicles-globally-to-fix-fuel-pumps (last visited May 18, 2020)

have no idea that the low-pressure fuel pumps in their supposedly safe and reliable Toyota and Lexus vehicles have a known safety defect and have been the subject of a massive recall.

**C.      NHTSA Complaints Reveal That the Fuel Pump Defect Poses Serious Safety Risks**

38.      Affected Vehicle owner complaints to NHTSA describe harrowing traffic events and near misses, making perfectly clear that this is not a defect that Toyota can continue to ignore.

39.      On March 11, 2019, the owner of a 2018 Toyota Camry filed the following complaint with NHTSA:

> Lag and hesitation when going to full throttle on the gas pedal. It hesitates for a second and then finally grabs on to accelerate. It has done this since I purchased it but was hoping it would work itself out eventually, but this hasn't happened. Toyota did a TSB software update for the 4 cylinder but not the V6.

40.      On August 9, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:[10]

> 2019 Highlander XLE loses power, unable to accelerate, & jerks and stalls in traffic. Bought at 200 miles, certified preowned. It is a nightmare vehicle.
>
> Accelerator has been touchy and jumpy at times, intermittently at slow speeds. First time it stalled it started to lose power put -put and chug like jerking and all dash and electrical on dash went out, unable to accelerate, then stalled out in road, unable to steer or control vehicle. This occurrence was after a longer period of driving. Second time it stalled out began to lose power, putter and chug, unable to accelerate applying gas pedal, getting no gas, vehicle dies out, unable to steer or control vehicle. This occurrence was after a longer period of driving. Third time was yesterday 8-8-19. Left work and about 5-7 minutes into my drive, started hesitating, losing all dash and electrical power and will not accelerate when gas pedal applied, then stalls out, unable to control the steering wheel again! Almost got hit this time, man behind me coming fast and had to swerve into lane over to miss me. ***This car is going to kill me or someone by causing an accident if they do not get it fixed right.*** After the second stall it was towed into dealership and they were not sure but said fuel pressure was reading 22 and was supposed to be

---

[10] All emphases added in NHTSA complaints, and all typos included as written.

in the mid to high 50's. They replaced the fuel pump and it drove ok for a little while but I noticed the average fuel mileage going down from an approx in city 19.1--20 to 17.1-17.3. Has never been so low so obviously the stalling and the replacing or the fuel pump are not the real issue. Fuel economy going down since replacement of the fuel pump and now another dangerous stalling issue. Car is at Toyota dealer now. They need to dive much deeper & resolve this very dangerous safety issue! I bought this car to feel safe and have reliable transportation and have neither. It really scares me.

41.     On February 9, 2019, the owner of a 2018 Toyota Camry filed the following

complaint with NHTSA:

I have had constant problems with my 2018 Camry since purchasing May 2018. My car is always jerking as I accelerate and when I'm driving in town, feels like I'm getting rear-ended and hesitating on highway when I have to accelerate into traiffic which is very dangerous when the car won't get up and go. I have had it to the dealer several times. They reset the computer because it can save settings from previous drivers. That didn't help. They told me that it's a different transmission and it takes few seconds for the computer to communicate back to transmission. ***This is a very unsafe feature***. …

42.     On September 11, 2019, the owner of a 2019 Toyota Highlander filed the following

complaint with NHTSA:

Severe hesitation when gas is applied, especially when crossing heavy traffic and instant power/quick acceleration needed. Also noted when going around corners, after car has slowed down below 5 mph to make the corner. Gas is applied with hesitation. Noted more when car is at a complete stand still/moving at slow speed then gas applied to move forward. Car does not move/react instantly. I notice this problem on a weekly (at least) basis.

43.     On September 11, 2019, the owner of a 2019 Toyota Highlander filed the following

complaint with NHTSA:

2019 Highlander XLE jerks and stalls, then loses power. This occured on a newly purchased vehicle that has approximately 13k miles on it, in stop and go traffic on a sub-urban street. No check engine light or other alert came on, providing no indication to the driver of the issue. Was able to restart the vehicle and drive it to the dealership. They said it was a fuel pressure issue, and are replacing

the fuel pump - a part that usually lasts more than 200,000 miles. I have no idea whether this is a fuel pump issue, or a fuel regulation issue, and if those functions are both performed by the fuel pump. The dealer did not seem to be aware of the issue, and there are no related recalls for this issue. They did find one other instance of this occurring when they researched it. I'd like to know for certain whether this is a fuel pump issue, or a fuel regulation issue. ***This presented a very dangerous situation, and I was lucky to be able to get off the road.***

44.     On October 17, 2019, the owner of a 2019 Toyota Highlander filed the following

complaint with NHTSA:

> The contact leases a 2019 Toyota Highlander. While driving, the engine stalled without warning and the steering wheel seized. The contact coasted the vehicle over to the side of the road and powered off the engine. The vehicle was restarted and was able to drive normally; however, the failure recurred twice. The vehicle was taken to page Toyota (21262 Telegraph Rd, Southfield, MI 48033, (248) 352-8580) where it was diagnosed, but the technician could not find a failure code. The vehicle was not repaired. The manufacturer was made aware of the failure and provided case number: 1910282286. The failure mileage was approximately 4,000.

45.     On October 20, 2019, the owner of a 2019 Highlander filed the following

complaint with NHTSA:

> Stopped at a stop light and when it turned green pushed on the gas pedal. The entire car jerked and didn't have any power to go through the intersection. The RPM gage began jumping as the car rolled. I rolled on through the intersection, was almost hit. Had no steering ability. Lights and alarms began going off. Message board said traction control turned off. Then check engine. Then visit dealer. Then the car died at the edge of the intersection and we pushed it off the highway onto a county road. It will not start at all. Acts like it isn't getting any gas. This is the 3 incident with this car doing this. We have towed it twice to the dealership. They replaced a valve in the engine. They said it was stuck. Apparently that wasn't what is wrong with it. Glad this wasn't on the interstate. ***We could have been killed.***

46.     On November 22, 2019, the owner of a 2018 Camry filed the following complaint

with NHTSA:

- 14 -

> When driving the vehicle, the transmission does not appear to know what gear to be in and is always searching. So much so that it will lunge at times when all you are trying to do is accelerate. When slowing down and then slowly applying gas again, nothing happens for a good 10 seconds and then it surges and causes my head to slam into the back of the head rest. Also while idling the vehicle is decently loud, more so when defroster is engaged. At freeway speeds it tends to do better, but most issues appear to be in city day to day driving from the transmission/ or fuel system.

47.     Consumers also complained about the Fuel Pump Defect on other websites that Toyota monitored, or should have been monitoring.

48.     For example, on carcomplaints.com, a popular site that collects complaints lodged by drivers, an owner of a 2018 Toyota Camry stated:

> The response time of accelerating and the car moving is significant at irregular intervals. This is hazardous when I am planning to overtake because it takes longer than expected.

49.     On carcomplaints.com, an owner of a 2018 Toyota Camry stated:

> When driving my vehicle I get a stalled response when pressing on the gas and then it jerks forward. This can be very dangerous when driving on the streets because there is a lot if stop and go movements. It usually happens when I come to a complete stop at a stop light or stop sign, even when stopping to turn down a street. I'm not sure why the vehicle does this, I just bought it so it should still be in very good shape. ***I'm reporting this because it can be a potential hazard for a car crash***. Please have Toyota fix this problem in their 2018 Toyota Camry se.

50.     The above complaints are just a small subset of the hundreds of complaints submitted to NHTSA for brake failures in the Affected Vehicles, which all tell the same central story of drivers depressing the brake pedals but getting no brake response. The safety implications are obvious, as illustrated by the dozens of accidents described above and the hundreds of accidents reported to NHTSA.

51.     It cannot reasonably be questioned that Toyota is now, and was long before it first began selling Affected Vehicles, fully aware of the Fuel Pump Defect in the Affected Vehicles.

- 15 -

Toyota has acquired that knowledge through at least: (1) NHTSA complaints; (2) warranty claims; (3) non-warranty repair records; (4) testing it claims to undertake in the development of new models; and (5) customer complaints to Toyota and its dealers.

52.     Like all vehicle manufacturers, Toyota monitors consumer reports and sentiments about its products that appear on social media, blogs, review sites, enthusiast sites, and other internet resources. Toyota has toll-free numbers and email and other communication systems that are devoted to obtaining information (and complaints) from consumers about their products. Toyota has certainly received numerous complaints about the Fuel Pump Defect in Affected Vehicles, as evidenced, in part, by the NHTSA complaints that expressly indicate contact with Toyota directly and its dealers.

53.     Toyota also receives technical information and reports from its dealers and service centers concerning warranty repairs, requests for warranty coverage, and safety complaints from vehicle owners.

**D.     Toyota Sells, Markets, and Advertises Toyota and Lexus Brand Vehicles as Safe and Reliable**

54.     Toyota spends hundreds of millions of dollars on advertising and focuses that advertising intently on claims of safety and reliability. Toyota knows and intends that consumers, including purchasers of Affected Vehicles, will buy their vehicles because they believe them to be safe and reliable.

55.     This image is an example of Toyota's consistent safety and reliability messaging.[11]

---

[11] https://www.toyota.com/usa/safety/ (last visited May 22, 2020).

010928-11/1271784 V1



56.     Toyota's website repeats its marketing message that Toyota vehicles are safe and reliable. Toyota states: "We build cars and trucks that help you and your family go places reliably and safely."[12]

57.     Lexus.com, which is owned and operated by Toyota, details the legion safety features on Lexus vehicles.[13] The consistent message in web advertising for Lexus is safety and reliability. For example, the Safety section of the Lexus website presently highlights: "5-star overall vehicle score for exceptional safety" and "A world without accidents is what we envision. While our goals for safety are ambitious, so are the innovations we create to bring us closer to them."

58.     Toyota has touted the safety of its vehicles for many years, including before and throughout its offering of Affected Vehicles. For example, in 2014, Toyota's website featured pages dedicated to "safety." Toyota touted the safety and reliability of its vehicles, stating, "Let's

---

[12] https://www.toyota.com/usa/our-story/ (visited May 22, 2020).

[13] *See, e.g.*, https://www.lexus.com/safety (visited May 22, 2020).

010928-11/1271784 V1

go places, safely."[14] Toyota claimed it designed vehicles "with the knowledge that safety is more

than features—it's the lives of the people who drive our cars."[15]

59.     Lexus.dmm parroted Toyota's safety and reliability messaging. In 2017, the Lexus

website stated: "Your safety is a top priority for Lexus."[16]

60.     In 2018, the Lexus website repeated its "safety" focus stating: "At Lexus, we're

constantly looking out for the driver.[17]

61.     In addition to its representations about Toyota and Lexus vehicles generally,

Toyota's websites for Toyota and Lexus contains specific representations about safety on the pages

for specific models of the Affected Vehicles.

62.     A car with the Fuel Pump Defect that can cause the engine to stutter or stall while

the vehicle is in motion exposes its occupants to the risk of injury and death. The Affected Vehicles

have the Fuel Pump Defect and are, therefore, not safe. Thus, Toyota's marketing of the Affected

Vehicles as safe and reliable is false and misleading and omits facts that would be material to

consumers who purchase or lease Affected Vehicles because Toyota consistently marketed the

them as safe and reliable.

63.     In conjunction with its representations touting safety and reliability, Toyota also

made false and misleading representations about the durability, power and functioning of the

engines of the Affected Vehicles. For the 2019 Toyota 4Runner, for example, Toyota touts its

---

[14] http://web.archive.org/web/20140920203532/http://toyota.com/usa/safety/fast-facts (last visited May 22, 2020).

[15] *Id.*

[16] http://web.archive.org/web/20170301045625/https://www.lexus.com/ (last visited May 21, 2020).

[17] http://web.archive.org/web/20180412233339/https://www.lexus.com/safety (last visited on May 21, 2020).

"durability," that the 4Runner is "[f]itted to survive," and tells drivers: "You won't fall short of power."



64.     For the 2018 Lexus RX, Toyota touts the vehicle's "exceptionally smooth performance":[18]

**THE FEARLESS 2018 RX**

The RX pairs leading-edge technology with exceptionally smooth performance.
Meanwhile, the first-ever three-row RXL delivers uncompromised styling with
added passenger capacity.

65.     Toyota has been making these representations about power and smoothness of the engines for years. It has even, as shown below, touted "a continuous feeling of acceleration":

---

[18] https://web.archive.org/web/20180513215900/http://www.lexus.com/models/RX/features (visited May 22, 2020).

- 19 -

**ENTICE WITH POWER**

Experience luxury that roars. A 3.5-liter V6 engine with direct and port fuel injection delivers exhilarating power with efficient fuel economy. With 295 horsepower, the RX 350 provides a continuous feeling of acceleration. For even greater control, an innovative dual Variable Valve Timing with intelligence (VVT-i) system offers precise engine performance as it reduces emissions and enhances fuel efficiency. VVT-i monitors the engine's speed and load, increasing torque at lower speeds for improved acceleration, and boosts performance at higher speeds by adjusting intake and exhaust valve timing.

66.     As with Toyota's representations about safety, these and similar representations about smoothness and acceleration are false and misleading. As admitted by Toyota, the Fuel Pump Defect that can lead to rough running, engine hesitation, and stalling while the vehicle is in motion, and can render Affected Vehicles inoperable while on the road.

67.     Toyota's advertising for Affected Vehicles conveys a pervasive message that Toyota and Lexus vehicles are safe and reliable. Safety and reliability are material to consumers when purchasing or leasing a vehicle.

68.     Toyota advertised Affected Vehicles as safe and reliable, but it concealed the danger of the Fuel Pump Defect. Toyota:

   a.      Failed to disclose, at and after the time of purchase, lease, and/or service, the Fuel Pump Defect, despite its knowledge;

   b.      Failed to disclose, at and after the time of purchase, lease, and/or service, that the Fuel Pumps were defective and not fit for their ordinary purpose, despite its knowledge; and

- 20 -

  c. Failed to disclose and actively concealed the existence and pervasiveness of the Fuel Pump Defect, despite its knowledge.

**E. Plaintiff and Class Members Would Not Have Purchased or Leased, or Would Have Paid Less for, Affected Vehicles Had They Known of the Fuel Pump Defect**

69. No owner or lessee of an Affected Vehicle would have purchased their vehicle, or at least would have paid less for their Affected Vehicle, had they known that the fuel delivery system might unexpectedly fail, or had they known that Toyota would fail to fix a known defect in the low-pressure fuel pump.

70. As a result of the Fuel Pump Defect in Affected Vehicles and the costs of repairs required to ameliorate it, Plaintiff and all owners of Affected Vehicles (the "Class") have suffered injury in fact, incurred damages, and have suffered harm as a result of Toyota's acts and omissions. Plaintiff and Class members seek remedies under the consumer protection statutes of the states in which they reside and/or purchased their Affected Vehicles, and also seek recovery for Toyota's breach of express warranty, breach of implied warranty, breach of the duty of good faith and fair dealing, and fraudulent concealment.

71. Plaintiff and each Class member suffered injury as they purchased their Affected Vehicle under the express and implied warranties that their vehicles would operate safely throughout the useful life of such vehicles. A vehicle containing the Fuel Pump Defect does not operate as warranted and for its intended purpose because it does not operate safely or reliably. In addition, an Affected Vehicle is worth less than a correctly operating/non-faulty Affected Vehicle.

**F. Toyota Has Manipulated Its Warranty to Minimize Its Obligation to Fix the Fuel Pump Defect in Affected Vehicles**

72. In connection with the sale of new vehicles, including the Affected Vehicles, Toyota provides a Limited New Vehicle Warranty ("LNVW") for the lesser of three years or 36,000 miles. Its powertrain warranty is for five years, or 60,000 miles.

- 21 -

73.     Under the caption "Basic Warranty," the LNVW states:

> This warranty covers repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, subject to the exceptions indicated under "What Is Not Covered" on pages 14-15.
>
> Coverage is for 36 months or 36,000 miles, whichever occurs first, with the exception of wheel alignment and wheel balancing, which are covered for 12 months or 20,000 miles, whichever occurs first.

74.     For the Lexus-branded Affected Vehicles, Toyota offered a written express Limited Warranty of four years or 50,000 miles. Toyota also offered a six-year 70,000-mile powertrain warranty.

75.     In order to obtain repairs under the LNVW, owners and lessees of covered vehicles are told by Toyota to present their vehicles to certified Toyota service centers, which are generally housed at Toyota dealerships.

76.     Toyota is not honoring the plain language of its warranty agreement. Even when owners of Affected Vehicles have presented their cars to Toyota service centers and complained of issues traceable to the Fuel Pump Defect, Toyota has: (1) failed to notify them of the Fuel Pump Defect in their Affected Vehicles; and/or (2) notified them of the recall associated with the Fuel Pump Defect, but refused to repair the defect or provide alternative/replacement transportation that is not defective. Likewise, Affected Vehicle owners who do not complain of issues relating to the Fuel Pump Defect are never informed of the Fuel Pump Defect in Affected Vehicles, and are never offered a repair.

### G.     Allegations Establishing Agency Relationship Between Manufacturer Toyota and Toyota Dealerships.

77.     Upon information and belief, Defendants impliedly or expressly acknowledged that Toyota-authorized dealerships are its sales agents, the dealers have accepted that undertaking,

- 22 -

Toyota has the ability to control authorized Toyota dealers, and Toyota acts as the principal in that relationship, as is shown by the following:

    i.       Manufacturer Toyota can terminate the relationship with its dealers at will;

    ii.      The relationships are indefinite;

    iii.    Manufacturer Toyota is in the business of selling vehicles as are its dealers;

    iv.    Manufacturer Toyota provides tools and resources for Toyota dealers to sell vehicles;

    v.     Manufacturer Toyota supervises its dealers regularly;

    vi.    Without Manufacturer Toyota, the relevant Toyota dealers would not exist;

    vii.    Manufacturer Toyota requires the following of its dealers:

        a.     Reporting of sales;

        b.     Computer network connection with Manufacturer Toyota;

        c.     Training of dealers' sales and technical personnel;

        d.     Use of Manufacturer Toyota-supplied computer software;

        e.     Participation in Manufacturer Toyota's training programs;

        f.      Establishment and maintenance of service departments in Toyota dealerships;

        g.     Certify Toyota pre-owned vehicles;

        h.     Reporting to Manufacturer Toyota with respect to the vehicle delivery, including reporting Class members' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

        i.      Displaying Manufacturer Toyota logos on signs, literature, products, and brochures within Toyota dealerships.

    viii.   Dealerships bind Manufacturer Toyota with respect to:

- 23 -

     a.     Warranty repairs on the vehicles the dealers sell; and

     b.     Issuing service contracts administered by Manufacturer Toyota.

ix.    Manufacturer Toyota further exercises control over its dealers with respect to:

     a.     Financial incentives given to Toyota dealer employees;

     b.     Locations of dealers;

     c.     Testing and certification of dealership personnel to ensure compliance with Manufacturer Toyota's policies and procedures; and

     d.     Customer satisfaction surveys, pursuant to which Manufacturer Toyota allocates the number of Toyota cars to each dealer, thereby directly controlling dealership profits.

x.    Toyota dealers sell Toyota vehicles on Manufacturer Toyota's behalf, pursuant to a "floor plan," and Manufacturer Toyota does not receive payment for its cars until the dealerships sell them.

xi.    Dealerships bear Toyota's brand names, use Toyota's logos in advertising and on warranty repair orders, post Toyota-brand signs for the public to see, and enjoy a franchise to sell Manufacturer Toyota's products, including the Affected Vehicles.

xii.    Manufacturer Toyota requires Toyota dealers to follow the rules and policies of Manufacturer Toyota in conducting all aspects of dealer business, including the delivery of Manufacturer Toyota's warranties described above, and the servicing of defective vehicles such as the Affected Vehicles.

xiii.    Manufacturer Toyota requires its dealers to post Toyota's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized Toyota dealers and servicing outlets for Manufacturer Toyota cars.

xiv.    Manufacturer Toyota requires its dealers to use service and repair forms containing Manufacturer Toyota's brand names and logos.

xv.    Manufacturer Toyota requires Toyota dealers to perform Manufacturer Toyota's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Manufacturer Toyota.

xvi.     Manufacturer Toyota requires Toyota dealers to use parts and tools either provided by Manufacturer Toyota, or approved by Manufacturer Toyota, and to inform Toyota when dealers discover that unauthorized parts have been installed on one of Manufacturer Toyota's vehicles.

xvii.    Manufacturer Toyota requires dealers' service and repair employees to be trained by Toyota in the methods of repair of Toyota-brand vehicles.

xviii.   Manufacturer Toyota audits Toyota dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix.     Manufacturer Toyota requires its dealers to provide Toyota with monthly statements and records pertaining, in part, to dealers' sales and servicing of Manufacturer Toyota's vehicles.

xx.      Manufacturer Toyota provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

xxi.     Manufacturer Toyota provides its dealers with specially trained service and repair consultants with whom dealers are required by Manufacturer Toyota to consult when dealers are unable to correct a vehicle defect on their own.

xxii.    Manufacturer Toyota requires Toyota -brand vehicle owners to go to authorized Toyota dealers to obtain servicing under Toyota warranties; and

xxiii.   Toyota dealers are required to notify Manufacturer Toyota whenever a car is sold or put into warranty service.

## VI.     TOLLING OF THE STATUTE OF LIMITATIONS

**A.     Discovery Rule Tolling**

78.     Class members had no way of knowing about Toyota's deception with respect to the Fuel Pump Defect in the Affected Vehicles.

79.     Within the time period of any applicable statutes of limitation, Plaintiff and members of the proposed classes could not have discovered through the exercise of reasonable diligence that Toyota was concealing the Fuel Pump Defect in the Affected Vehicles and misrepresenting the safety, quality and reliability of the Affected Vehicles.

- 25 -

80.     Plaintiff and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Toyota did not report information within their knowledge to federal and state authorities, the dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Toyota had concealed information about the true nature of the Fuel Pump Defect in the Affected Vehicles, which was discovered by Plaintiff only shortly before this action was filed. Nor, in any event, would such an investigation on the part of Plaintiff and other Class members have disclosed that Toyota valued profits over the safety of its customers, their friends and family and innocent bystanders.

81.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims asserted herein.

**B.     Fraudulent Concealment Tolling**

82.     All applicable statutes of limitation have also been tolled by the Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

83.     Instead of disclosing the existence of the Fuel Pump Defect, Toyota falsely represented that the Affected Vehicles were safe, dependable, reliable and of high quality.

**C.     Estoppel**

84.     The Defendants were under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of the fuel delivery system in the Affected Vehicles.

85.     The Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fuel delivery system in the Affected Vehicles.

- 26 -

86.     Based on the foregoing, the Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.    CLASS ALLEGATIONS

87.     Plaintiff brings this action on behalf of himself and as a class action pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses (collectively, the "Classes"):

**The Nationwide Class**

> All persons or entities in the United States who owned and/or leased a Toyota or Lexus vehicle that uses the Denso low-pressure fuel pumps and fuel pump assemblies that begin with part number prefixes 23220- and 23221-, including those models described herein as Affected Vehicles.

**The Florida Subclass**

> All persons or entities in the state of Florida who owned and/or leased a Toyota or Lexus vehicle that uses the Denso low-pressure fuel pumps and fuel pump assemblies that begin with part number prefixes 23220- and 23221-, including those models described herein as Affected Vehicles.

88.     Excluded from the Class are individuals who have personal injury claims resulting from the fuel delivery system in the Affected Vehicles. Also excluded from the Class are the Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family. Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

89.     Certification of Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of his claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

90.     This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

91.     **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes—based on publicly available sales data for the Affected Vehicles—that there are millions of members of the Class, the precise number of Class members is unknown to Plaintiff but may be ascertained from the Defendants' books and records, as well as the recall reports that Toyota has submitted to NHTSA. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

92.     **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) & (b)(3): This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

a.     Whether the Defendants engaged in the conduct alleged herein;

b.     Whether the Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Affected Vehicles into the stream of commerce in the United States;

c.     Whether the Affected Vehicles contain a defect in their fuel delivery system and if so, whether it is a safety defect;

d.     Whether the Defendants knew about the defect in the fuel delivery system of the Affected Vehicles and, if so, how long the Defendants have known;

e.     When the Defendants discovered the Fuel Pump Defect in the Affected Vehicles, and what, if anything, they did in response;

f.     Whether Defendants have sought to minimize their warranty expenses by refusing to repair the Fuel Pump Defect in the Affected Vehicles;

g.     Whether the Defendants' conduct violates consumer protection statutes and constitutes breach of contract and fraudulent concealment as asserted herein;

- 28 -

h.  Whether Plaintiff and the other Class members overpaid for their Affected Vehicles;

i.  Whether Plaintiff experienced out-of-pocket losses from replacing parts as a result of the Fuel Pump Defect, and if so, how much; and

j.  Whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

93.  **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the Defendants' wrongful conduct as described above.

94.  **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff and his counsel.

95.  **Declaratory Relief**: Federal Rule of Civil Procedure 23(b)(2): the Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate declaratory relief, with respect to each Class as a whole.

96.  **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against the Defendants, so it would be impracticable for the members of the Classes to individually seek redress for the Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential

for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**A.    Claims Brought on Behalf of the Nationwide Class**

**COUNT I**

**VIOLATIONS OF 15 U.S.C. § 2301, *ET SEQ.***
**THE MAGNUSON-MOSS WARRANTY ACT**

97.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

98.    This claim is brought on behalf of the Nationwide Class.

99.    Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

100.    Toyota is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

101.    The Affected Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

102.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

103.    Toyota's LNVW is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Affected Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

104.    Toyota breached these warranties, as described in more detail above. Without limitation, the Affected Vehicles are equipped with a defective fuel delivery system that fails to

- 30 -

function as expected, and can cause loss of power and stalls, leading to vehicle accidents and collisions. The Affected Vehicles share a common design defect in that the fuel delivery system fails to operate as represented by Toyota.

105.    Plaintiff and the other Class members have had sufficient direct dealings with either Toyota or its agents (*e.g.*, dealerships and technical support) to establish privity of contract between Toyota on one hand, and Plaintiff and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Toyota and its dealers, and specifically, of Toyota's implied warranties. The dealers were not intended to be the ultimate consumers of the Affected Vehicles and have no rights under the warranty agreements provided with the Affected Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

106.    Affording Toyota a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

107.    At the time of sale or lease of each Affected Vehicle, Toyota knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Affected Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Toyota has expressly admitted the existence of the Fuel Pump Defect and that it is a safety defect, but notwithstanding its recall of millions of Affected Vehicles, it has not offered a fix or indicated that a fix is available. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resorts to an informal dispute resolution procedure and/or afford Toyota a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

108.    Plaintiff and the other Class members would suffer economic hardship if they returned their Affected Vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the other Class members have not re-accepted their Affected Vehicles by retaining them.

109.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

110.    Plaintiff, individually and on behalf of the other Class members, seeks all damages permitted by law, including diminution in value of the Affected Vehicles, in an amount to be proven at trial.

**COUNT II**

**FRAUDULENT CONCEALMENT**
**(BASED ON COMMON LAW)**

111.    Plaintiff restates and realleges, and incorporates herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows:

112.    Plaintiff brings this Count on behalf of himself and the Nationwide Class or, in the alternative, on behalf of the Florida Subclass.

113.    Defendants intentionally concealed that the Affected Vehicles are defective.

114.    Defendants further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each Affected Vehicle and on its website, that the Affected Vehicles they were selling had no significant defects, that the Affected Vehicles were safe, reliable and of high quality, and would perform and operate in a safe manner.

- 32 -

115.     Defendants knew about the defect in the Affected Vehicles when these representations were made.

116.     The Affected Vehicles purchased by Plaintiff and the other Class members contained defective fuel delivery systems.

117.     Defendants had a duty to disclose that the Affected Vehicles contained a fundamental defect as alleged herein, because Plaintiff and the other Class members relied on Defendants' material representations.

118.     As alleged herein, at all relevant times, Defendants have held out the Affected Vehicles to be free from defects such as the Fuel Pump Defect. Defendants touted and continue to tout the many benefits and advantages of the Affected Vehicles, but nonetheless failed to disclose important facts related to the defect. This made Defendants' other disclosures about the Affected Vehicles deceptive.

119.     The truth about the defective Affected Vehicles was known only to Defendants; Plaintiff and the other Class members did not know of these facts and Defendants actively concealed these facts from Plaintiff and Class members.

120.     Plaintiff and the other Class members reasonably relied upon Defendants' deception. They had no way of knowing that Defendants' representations were false, misleading, or incomplete. As consumers, Plaintiff and Class members did not, and could not, unravel Defendants' deception on their own. Rather, Defendants intended to deceive Plaintiff and Class members by concealing the true facts about the Affected Vehicles.

121.     Defendants' false representations and omissions were material to consumers because they concerned safety of the Affected Vehicle, which played a significant role in the value of the Affected Vehicle.

122.     Defendants had a duty to disclose the Fuel Pump Defect and violations with respect to the Affected Vehicle because they concerned the safety of the Affected Vehicles, the details of the true facts were known and/or accessible only to Defendants, because Defendants had exclusive knowledge as to such facts, and because Defendants knew these facts were not known to or reasonably discoverable by Plaintiff or Class members.

123.     Defendants also had a duty to disclose because it made general affirmative representations about the safety and reliability of the Affected Vehicles, without telling consumers that the Affected Vehicles had a fundamental system defect that would affect the safety, quality and reliability of the Affected Vehicle.

124.     Defendants' disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the Fuel Pump Defect as set forth herein. These omitted and concealed facts were material because they directly impact the safety and value of the Affected Vehicles purchased by Plaintiff and Class members.

125.     Defendants have still not made full and adequate disclosures and continue to defraud Plaintiff and Class members by concealing material information regarding the defect in the Affected Vehicles.

126.     Plaintiff and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for the Affected Vehicles with the Fuel Pump Defect, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Class members' actions were justified. Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Class members.

127.     Because of the concealment and/or suppression of facts, Plaintiff and Class members sustained damage because they own Affected Vehicles that are diminished in value as a result of Defendants' concealment of the true safety and quality of the Affected Vehicles. Had Plaintiff and Class members been aware of the Fuel Pump Defect, and Defendants' disregard for the truth, Plaintiff and Class members would have paid less for their Affected Vehicles or would not have purchased them at all.

128.     The value of Plaintiff's and Class members' Affected Vehicles have diminished as a result of Defendants' fraudulent concealment of the Fuel Pump Defect, which has made any reasonable consumer reluctant to purchase an Affected Vehicle, let alone pay what otherwise would have been fair market value for the Affected Vehicle.

129.     Accordingly, Defendants are liable to Plaintiff and Class members for damages in an amount to be proven at trial.

130.     Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and the representations that Defendants made to them, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT III

### BREACH OF CONTRACT
### (COMMON LAW)

131.     Plaintiff restates and realleges, and incorporates herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows.

132.     Plaintiff asserts this Count on behalf of himself and the Nationwide Class or, in the alternative, on behalf of the Florida Subclass.

- 35 -

133.    Defendants' misrepresentations and omissions alleged herein, including but not limited to, Defendants' concealment and suppression of material facts concerning the Affected Vehicles, including the reliability and durability of the fuel delivery system, caused Plaintiff and the other Class members to make their purchases or leases of their Affected Vehicles.

134.    Absent those misrepresentations and omissions, Plaintiff and the other Class members would not have purchased or leased these Affected Vehicles, would not have purchased or leased these Affected Vehicles at the prices they paid, and/or would have purchased or leased a different vehicles that did not contain the Defective Fuel Pump. Accordingly, Plaintiff and other Class members overpaid for their Affected Vehicles and did not receive the benefit of their bargain.

135.    Each and every sale or lease of an Affected Vehicle constitutes a contract between Defendants and the purchaser or lessee. Defendants breached these contracts by selling or leasing to Plaintiff and the other Class members defective Affected Vehicle and by misrepresenting or failing to disclose material facts concerning the safety, durability, performance, and quality of the Affected Vehicles.

136.    As a direct and proximate result of Defendants' breach of contract, Plaintiff and other Class members have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**B.      Claims Brought on Behalf of the Florida Subclass**

**COUNT IV**

**VIOLATIONS OF THE FLORIDA DECEPTIVE AND
UNFAIR TRADE PRACTICES ACT ("FDUTPA")
(FLA. STAT. ANN. § 501.201, *ET SEQ.*)**

137.    Plaintiff restates and realleges, and incorporates herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows:

- 36 -

138.    Plaintiff brings this Count on behalf of himself and all similarly situated residents of the state of Florida for violations of Florida's Deceptive and Unfair Trade Practices Act.

139.    Plaintiffs and other Florida Subclass members who purchased their vehicles new are "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.203(7).

140.    Defendants engaged in "trade or commerce" within the meaning of Fla. Stat. Ann. § 501.203(8).

141.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein. In the course of its business, Defendants concealed and suppressed material facts concerning the Fuel Pump Defect. Defendants falsely represented the quality of the Affected Vehicles and omitted material facts regarding the fuel pump, as well as the durability and overall value of the Affected Vehicles, for the purpose of inducing Plaintiff and other Florida Subclass members to purchase the Affected Vehicles, and to increase Defendants' revenue and profits.

142.    The facts concealed and omitted by Defendants were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and other Florida Subclass members known of the Fuel Pump Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

143.    Defendants' conduct proximately caused injuries to Plaintiff and the other Florida Subclass members.

144.    Plaintiff and the other Florida Subclass members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiff and the other Florida Subclass members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations, fraud, deceptive practices, and omissions.

145.    Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

146.    Accordingly, Defendants are liable to Plaintiffs and the other Florida Subclass members for damages in an amount to be proven at trial.

**COUNT V**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(FLA. STAT. ANN. §§ 672.314 AND 680.212)**

147.    Plaintiff restates and realleges, and incorporates herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows:

148.    Plaintiff brings this Count on behalf of himself and all other similarly situated residents of the state of Florida for violations of implied warranty of merchantability under Florida law.

149.    Defendants were at all times a "merchant" with respect to motor vehicles under Fla. Stat. Ann. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

150.    With respect to leases, each Defendant is and was at all relevant times a "lessor" of motor vehicles under Fla. Stat. Ann. § 680.1031(1)(p).

151.    The Affected Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. Ann. §§ 672.105(1) and 680.1031(1)(h).

152.    A warranty that the Affected Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law, pursuant to Fla. Stat. Ann. §§ 672.314 and 680.212.

153.    The Affected Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

154.    Defendants marketed the Affected Vehicles as safe, reliable, and high quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Florida Subclass members' decisions to purchase the Affected Vehicles.

155.    Plaintiff and other Florida Subclass members purchased the Affected Vehicles from Defendants, or through Defendants' authorized agents for retail sales. At all relevant times, Defendants were the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles.

156.    Defendants knew or had reason to know of the specific use for which the Affected Vehicles were purchased.

157.    Because of the Fuel Pump Defect, the Affected Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

158.    Defendants knew about the defect in the Affected Vehicles, allowing Defendants to cure their breach of warranty if they chose.

159.    Defendants' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendants' warranty

limitations are unenforceable because they knowingly sold a defective product without informing consumers about the defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiff and other Florida Subclass members. Among other things, Plaintiff and other Florida Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Florida Subclass members, and Defendants knew of the defect at the time of sale.

160.    Plaintiff and Florida Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein. Affording Defendants a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

161.    Defendants were provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

162.    Accordingly, Defendants are liable to Plaintiff and Florida Subclass members for damages in an amount to be proven at trial.

## COUNT VI

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (BASED ON FLORIDA STATE LAW)

163.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

164.    Plaintiff brings this Count on behalf of himself and all similarly situated residents of the state of Florida.

165.    Plaintiff and Florida Subclass members entered into contracts with Defendants in connection with the sale of the Affected Vehicles.

- 40 -

166.    Plaintiff and Florida Subclass members gave fair and reasonable consideration and performed all their material obligations under the contracts.

167.    Implied in all contracts is a covenant of good faith and fair dealing, imposing a duty on the parties to act in good faith and deal fairly with one another.

168.    Plaintiff and Florida Subclass members had a reasonable expectation that when they purchased their Affected Vehicles from Defendants, the Affected Vehicles would be free of defects, especially defects that affected the safety and operability of the Affected Vehicles.

169.    Defendants used their discretion to place inferior low-pressure fuel pumps into the Affected Vehicles without informing Plaintiff and Florida Subclass members that the inferior technology would create a safety defect in the Affected Vehicles.

170.    Plaintiff and Florida Subclass members had no reason to know Defendants had placed inferior low-pressure fuel pumps into the Affected Vehicles.

171.    By creating and promoting an automobile with a latent safety defect, Defendants breached the covenant of good faith and fair dealing and breached its contractual duty to Plaintiff and Florida Subclass members.

172.    As a direct and proximate result of Defendants' breach, Plaintiff and Florida Subclass members suffered damages, including being induced to purchase the defective Affected Vehicles.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Nationwide Class and State Subclasses, respectfully requests that the Court enter judgment in his favor and against the Defendants, as follows:

A.    Certification of the proposed Nationwide Class and State Subclasses, including appointment of Plaintiff's counsel as Class Counsel;

B.      Restitution, including at the election of Class members, recovery of the purchase price of their Affected Vehicles, or the overpayment or diminution in value of their Affected Vehicles;

C.      Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial, except that monetary relief under certain consumer protection statutes, as stated above, shall be limited prior to completion of the applicable notice requirements;

D.      An order requiring the Defendants to pay both pre- and post-judgment interest on any amounts awarded;

E.      An award of costs and attorneys' fees; and

F.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: May 29, 2020

Respectfully submitted,

By: */s/ Stuart Z. Grossman*
STUART Z. GROSSMAN, ESQ. (FBN 156113)
szg@grossanroth.com
RACHEL W. FURST, ESQ. (FBN 45155)
rwf@grossmanroth.com
STEVE W. BERMAN, ESQ.(to be admitted *pro hac vice*)
steve@hbsslaw.com
THOMAS E. LOESER, ESQ.(to be admitted *pro hac vice*)
toml@hbsslaw.com
JERROD C. PATTERSON, ESQ. (to be admitted *pro hac vice*)
jerrodp@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

*Attorneys for Plaintiff and the Proposed Class*